1        UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                  )
     United States of America,    )   File No. 19-MJ-148
4                                 )              (HB)
            Plaintiff,            )
5                                 )
     v.                           )   St. Paul, Minnesota
6                                 )   March 13, 2019
     Andrew Nathaniel David       )   1:35 p.m.
7    Piontek,                     )
                                  )
8           Defendant.            )
     ------------------------------------------------------------
9
            BEFORE THE HONORABLE HILDY BOWBEER
10       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
      **(AUDIO TRANSCRIPTION OF:  PRELIMINARY & DETENTION HEARING)**
11
     **APPEARANCES**
12    **For the Plaintiff:**        **U.S. ATTORNEY'S OFFICE**
                                  **JORDAN SING, AUSA**
13                                **LAURA PROVINZINO, AUSA**
                                  300 S. 4th St., #600
14                                Minneapolis, Minnesota 55415

15    **For the Defendant:**        **OFFICE OF THE FEDERAL DEFENDER**
                                  **MANNY ATWAL, AFD**
16                                300 S. 4th St., #175
                                  Minneapolis, Minnesota 55415
17
     Transcribed by:              DEBRA K. BEAUVAIS, RPR-CRR
18                                300 S. 4th St., #1005
                                  Minneapolis, Minnesota 55415
19

20

21
         Proceedings recorded by mechanical stenography;
22   transcript produced by computer.

23

24

25

1          **P R O C E E D I N G S**

2             **IN OPEN COURT**

3          THE COURT:  We are in court this afternoon in the

4    matter of United States of America v. Andrew Piontek.  This

5    is Matter No. 19-MJ-148, and we're here on a preliminary

6    probable cause hearing and detention hearing because there's

7    a complaint in this case, rather than an indictment at this

8    point.

9          Let me start by getting appearances, first on

10   behalf of the United States.

11         MR. SING:  Good afternoon, Your Honor.  Jordan

12   Sing appearing on behalf of the government.  With me at

13   counsel table is Laura Provinzino and HSI Special Agent

14   Travis Hamblen.

15         THE COURT:  Okay.  Good afternoon.

16         And on behalf Mr. Piontek.

17         MS. ATWAL:  Good afternoon, Your Honor.  Manny

18   Atwal on behalf of Mr. Piontek, who is sitting next to me.

19         THE COURT:  Okay.  So, as I indicated, we're here

20   both for a probable cause hearing and for a detention

21   hearing.

22         Is the government still moving to detain

23   Mr. Piontek?

24         MR. SING:  Yes, Your Honor.

25         THE COURT:  All right.  And do you intend to call

1     witnesses?

2              MR. SING:  We will call Special Agent Hamblen.

3              THE COURT:  All right.  Ms. Atwal, just so I know,

4     do you intend to call any witnesses in connection with this

5     hearing?

6              MS. ATWAL:  No, Your Honor.

7              THE COURT:  All right.  Then you can go ahead,

8     Mr. Sing.

9              MR. SING:  Thank you, Your Honor.  The government

10    calls Special Agent Hamblen to the stand.

11             THE COURT:  Please raise your right hand.

12             (Witness administered oath by the Court.)

13             THE COURT:  All right.  Please be seated.

14             And, Mr. Sing, I assume you will cover both

15    probable cause and any testimony that you want to introduce

16    around detention as well?

17             MR. SING:  Yes, Your Honor.

18             THE COURT:  Okay.

19             MR. SING:  And then I would ask to argue after

20    Ms. Atwal questions him.

21             THE COURT:  Right.  All right.

22             MR. SING:  Okay.

23             THE COURT:  Please go ahead.

24             MR. SING:  Thank you, Your Honor.

25

HAMBLEN - DIRECT                                                    4

1      **TRAVIS HAMBLEN**

2                          **DIRECT EXAMINATION**

3      **BY MR. SING:**

4      Q.  Special Agent Hamblen, can you tell us about your

5      current job title and responsibilities.

6      A.  I'm a special agent with Homeland Security

7      Investigations in St. Paul, Minnesota.

8      Q.  And do you have training and experience involving cases

9      of child exploitation or child pornography?

10     A.  I do.

11     Q.  What is that experience and training?

12     A.  I was trained originally at the Federal Law-Enforcement

13     Training Center on the basics of conducting child

14     pornography and exploitation investigations.  And then over

15     the past 22 years, I have been involved in several

16     investigations.

17     Q.  Is it in that capacity that you became involved in the

18     current case involving Mr. Piontek?

19     A.  That's correct.

20     Q.  So I'd like to draw your attention to December 11th of

21     2018.  Is that when you first became involved in the

22     investigation involving Mr. Piontek?

23     A.  That's correct.

24     Q.  And was Mr. Piontek engaged in international travel or

25     what led to the start of this investigation?

HAMBLEN - DIRECT

1    A.  Correct.  Mr. Piontek was returning to the United States

2    from a trip to Thailand and other places.  He returned on a

3    flight from Amsterdam landing at the Minneapolis airport.

4    Q.  And what led to Mr. Piontek being searched by custom and

5    border patrol?

6    A.  Mr. Piontek was referred for a secondary inspection,

7    basically routine procedure that happens when you return to

8    the United States in which the customs officers determine if

9    you're bringing contraband items or such things.  That's

10   just a part of their normal entry process for Americans

11   returning.

12   Q.  What was discovered during the secondary search?

13   A.  Mr. Piontek had multiple electronic devices, but, more

14   importantly, he had a thumb drive which was located by one

15   of the officers.  It was in his baggage and it was further

16   located hidden inside of a water bottle-type item.

17   Q.  And when you say "hidden," can you describe what you

18   mean by -- how was it hidden?

19   A.  So it was -- I may slightly misdescribe, but let's say

20   it's a plastic water bottle-looking device, and inside of it

21   he had a sock and inside the sock was a small thumb drive,

22   maybe two inches in length, half an inch wide, very clearly

23   looked like the normal thumb drive, but it was wrapped up

24   inside of a sock.  And that became very suspicious to the

25   officers that were going through his belongings because it's

1    not something you would normally find.

2    Q.  Did you have an opportunity to speak with Mr. Piontek

3    after this discovery?

4    A.  I did.

5    Q.  And was that a Mirandized interview?

6    A.  Yes, it was.

7    Q.  Did you have a chance to ask Mr. Piontek about this

8    hidden thumb drive?

9    A.  I did.  I talked to him about that thumb drive and the

10   other devices that he had, and he freely admitted that the

11   thumb drive and -- well, actually, he told me that the thumb

12   drive and the computer -- he had a MacBook Pro computer --

13   both contained child pornography.  And when I asked him to

14   describe what he meant by the child pornography, he said

15   that it was images and videos of children about eight years

16   of age or slightly older engaged in sexual activities or

17   naked.

18   Q.  Did Mr. Piontek indicate how many of the devices would

19   have contained child pornography at that point?

20   A.  I believe he said that two of the devices would have

21   child pornography on them.

22   Q.  Were you able to ask Mr. Piontek about the custody of

23   these devices, if they were his or someone else's?

24   A.  Correct.  I spoke with him at a pretty good length about

25   who the owner of the devices were, who had access to the

HAMBLEN - DIRECT

1    devices, and he told me that they were all his devices, that

2    he was the only person that had access, that they were --

3    all had passwords which restricted access to them.  And I

4    asked him if he was married or had a roommate or somebody

5    else that could have accessed the devices and he said, No,

6    and he then provided me with the passwords so that we could

7    get into the devices.

8    Q.  And did you have the chance to ask Mr. Piontek about how

9    he came to possess these devices if he downloaded them or

10   where they came from?

11   A.  So the -- you're asking about the content on the

12   devices?

13   Q.  Yeah, how he actually got that content.

14   A.  He said that he had downloaded them through the

15   internet, both while in the United States and while in

16   foreign countries.  I think he actually said in Thailand.

17   Q.  And did you have an opportunity to ask Mr. Piontek about

18   actually carrying this content overseas?  Had he traveled

19   with this content?

20   A.  During that interview, I believe I did, but I -- more

21   specifically, I had interviewed him on a second date and he

22   specifically told me that prior to being caught on December

23   11th possessing the child pornography, that he had

24   previously traveled international twice with device -- with

25   devices or child -- that contained child pornography.

 1    Q.  In the course of your investigation, were you able to

 2    research Mr. Piontek's history of traveling abroad?

 3    A.  I have.

 4    Q.  What did you learn about the frequency of such trips?

 5    A.  So just speaking as to the previous ten years, because

 6    he has international travel that goes back probably over 20

 7    years, but just looking at the most recent 10 years, he has,

 8    I believe it was, 24 separate trips abroad.

 9    Q.  And did that travel include any notable or frequent

10    locations when you looked?

11    A.  He routinely went to places that in the world of child

12    pornography, child exploitation investigations that are

13    interesting to us because they are places that are

14    well-known for the ability to obtain sex with children and

15    other acts of that nature; so, for example, Thailand, the

16    Dominican Republic, the Ukraine.  These were all places

17    where it's well-known in the community of child pornography

18    that sex tourism is available or more readily available than

19    most places.

20    Q.  And are these places you mentioned -- Thailand, Ukraine

21    and Dominican Republic -- are those locations that

22    Mr. Piontek had traveled?

23    A.  Extensively, yes.

24    Q.  Were you able to learn about Mr. Piontek's employment

25    status?

1    A.  At the time, in December -- actually, as well as when he

2    was arrested last week -- he was unemployed.  I believe

3    officially he's unemployed; although, he sought out

4    part-time employment working as an Uber driver.

5    Q.  Did Mr. Piontek suggest that any of his travel to these

6    locations was for business purposes?

7    A.  No.  I believe it was all for personal reasons.

8    Q.  After speaking with Mr. Piontek on December 11th, did

9    you have the opportunity to review the electronic devices

10   that he was traveling with?

11   A.  Yes.  We -- I submitted the devices for a review by a

12   computer forensic agent, and I was present during the very

13   beginning of the initial examination of the devices.

14   Q.  And did you locate images or traces of child pornography

15   on those devices?

16   A.  There were thousands of images.  I only stayed for a

17   very brief period because it was just very disturbing and

18   not something that I wanted to stay.  We usually allow --

19   have the forensics agents do the remainder, but we'll come

20   for the initial evaluation just to determine if it's

21   blatantly obvious that there's child pornography and the

22   nature of what was collected.

23   Q.  Now, I believe that you testified that Mr. Piontek had

24   said there was child pornography on two of his devices.  Is

25   that right?

1     A.  That's what he told me in December.

2     Q.  Is that consistent with what you found during this

3     initial review?

4     A.  So the computer forensics found that there was either

5     child pornography or traces of previously-deleted child

6     pornography or messaging related to sex tourism, things of

7     that nature.  All basically -- all the devices basically

8     contained some type of evidence of involvement in child

9     pornography or sex tourism.

10    Q.  You also indicated that Mr. Piontek stated that the

11    child pornography involved children ages eight and up; is

12    that correct?

13    A.  That's what he told me.

14    Q.  And is that the types of pornography you saw during this

15    initial review?

16    A.  Yes.  There were videos of children significantly

17    younger than eight, probably about three years of age I want

18    to say, just some very disturbing images.

19    Q.  And to date have you been able to do a comprehensive and

20    complete analysis of these seven devices?

21    A.  So our forensics agents are in the process, but the

22    complete examination requires probably thousands of hours of

23    manpower to go through each -- all these devices there's

24    just so much data.  But they have done their initial

25    findings and determined such things as that there's several

HAMBLEN - DIRECT

1    thousand images and videos of child pornography.

2    Q.  One of the devices seized was an iPhone 7; is that

3    correct?

4    A.  Correct.

5    Q.  Did you have a chance to look at the internet search

6    history of that iPhone 7?

7    A.  I did.

8    Q.  And I'd like to direct your attention to July 29th of

9    2017.  Do you recall that date as it relates to the internet

10   search history?

11   A.  Yes.  So while we were -- or while I was reviewing that

12   device, I noticed several chat logs, communications through

13   some secure applications like What's App.  They are all

14   applications that are pretty routinely used for covert

15   communications or encrypted communications.  And at that

16   time, in July of 2017, the phone through its GPS indicates

17   that the device is located in the Ukraine.  And at the same

18   time that the device is in the Ukraine searches are being

19   made and they are for terms such as how to locate pedophile

20   sex in the Ukraine, how to locate child prostitutes in Kiev,

21   some inquiries of that nature.

22   Q.  Do you know through your review if Mr. Piontek was in

23   the Ukraine at this time?

24   A.  He was.  And the interview last Saturday where I

25   interviewed Mr. Piontek, he told me that he was in fact in

1   the Ukraine and that he did make those searches.

2   Q.  Were you able to locate other -- you mentioned encrypted

3   chats.  Were you able to review those for any indication of

4   sex tourism behavior?

5   A.  Yes.  There's extensive amounts of information.  A lot

6   of it we can't get the whole picture on because it's through

7   applications that are either encrypted or -- and it's going

8   to take the government a significant amount of time to

9   actually get to the bottom of the actual full content, but

10  the stuff that I can see there's extensive communications

11  with persons -- either prostitutes or persons offering the

12  services of prostitutes in which he's negotiating for sexual

13  activity, certain sex acts for certain amounts of money and

14  things of that nature.

15  Q.  So after this interaction on December 11th of 2018, are

16  you aware if Mr. Piontek again traveled abroad?

17  A.  Yes.  He just returned this weekend.

18  Q.  And do you know where he returned from?

19  A.  I believe he was in Thailand this time.  Technically his

20  flight returned from Hong Kong, I believe.  But I believe

21  ultimately he spent most of his time in Thailand.

22  Q.  And is it at that time that Mr. Piontek was arrested on

23  the current criminal complaint?

24  A.  That's correct.

25  Q.  Did you have a chance to interview Mr. Piontek when he

HAMBLEN - DIRECT

1   was arrested on March 9th?

2   A.  I did.

3   Q.  And was that also after a post-Mirandized -- or you read

4   him his Miranda rights first?

5   A.  I once again Mirandized him, and he agreed to speak with

6   me.

7   Q.  Were you able to ask Mr. Piontek what his reasoning for

8   being in Thailand was at that time?

9   A.  He told me that this particular trip was to visit a

10  woman that he had met in Thailand in the past, so -- I

11  believe over the internet.

12  Q.  Did you have an opportunity to ask Mr. Piontek about the

13  child pornography you had located on his devices previously?

14  A.  Yes.

15  Q.  And what did -- what did you learn during the course of

16  that conversation?

17  A.  Well, first, I confronted him about the fact -- when I

18  say confront, I brought up the fact in the nicest possible

19  way that I thought that he had significantly more than 200

20  images and that it looked like more like 2 or 3,000 images,

21  and he agreed with me.  And we also discussed the main

22  reason that I wanted to speak with him after his arrest was

23  I was very concerned about the text messages or messaging

24  that he had and the search -- internet searches related to

25  trying to obtain sex with children while abroad.

1    Q.  Before we get to the questions you asked him about those

2    text messages, did you have a chance to ask Mr. Piontek if

3    he was continuing to view child pornography after your

4    interview in December of 2018?

5    A.  Yes.  He told me that he was no longer collecting child

6    pornography, that he would simply go onto the internet

7    through some covert means.  But he would go onto the

8    internet and browse child pornography now, as opposed to

9    collecting it.

10   Q.  Did Mr. Piontek ever describe to you if he had ever

11   distributed this child pornography in the past?

12   A.  He said that he had in the past.

13   Q.  And you said that you had an opportunity to ask

14   Mr. Piontek about these internet searches about finding sex

15   with children.  Can you tell me about the nature of that

16   conversation.

17   A.  He told me that he did in fact make those searches.  We

18   were specifically talking about -- it was in July of 2017, I

19   can't remember the specific date, but that he had made these

20   searches and he admitted that, yes, he had in fact made the

21   searches.  He was curious.

22          And I further talked to him about my concerns that

23   somebody being a collector moving into the realm of being an

24   actor seeking out, because that was the basic basis of our

25   -- of the reasoning behind my interview of him.

1    Q.  Were you able to ask Mr. Piontek if the searches that he

2    placed were at all connected with the destinations that he

3    traveled to?

4    A.  Yes.  He agreed.  I brought to his attention that these

5    were all places that I knew that sex tourism or obtaining

6    sexual services from children was much more likely, and he

7    agreed that this was the case and --

8    Q.  Do you recall how he agreed with you?  Did he say

9    anything specific about these locations?

10   A.  I believe the wording was it was an added bonus.  He

11   denied that this was the sole means of his trip or sole

12   reason for his trips there, but he did agree that it was an

13   added bonus to be able to explore the opportunities or the

14   possibilities of sex with children or sex tourism.

15            MR. SING:  Thank you, Your Honor.  I don't have

16   anything further for Mr. Hamblen at this time.

17            THE COURT:  Thank you.

18            Ms. Atwal.

19            MS. ATWAL:  Thank you, Your Honor.

20

21                    **CROSS-EXAMINATION**

22   **BY MS. ATWAL:**

23   Q.  Agent, let's go back to your experience.  You said you

24   have experience in child exploitation cases, correct?

25   A.  Correct.

HAMBLEN - CROSS

1   Q.  And you've done this for how long?

2   A.  Twenty-two-and-a-half years.

3   Q.  Is this your first child pornography case?

4   A.  This is the first case that I've charged.  I've

5   participated in dozens:  assisted with the search warrants,

6   initial interviews, arrests, so forth.  But normally --

7   normally I would be in an assisting capacity in these types

8   of investigations.

9   Q.  So this is your first case, though, where you have been

10  in charge, correct?

11  A.  Correct.

12  Q.  Now, you would agree with me that child-pornography

13  images -- let me find your words -- are all very disturbing,

14  correct?

15  A.  The ones that I reviewed in my time as a law-enforcement

16  officer have been, yes.

17  Q.  Now, you discussed that at least twice you interviewed

18  Mr. Piontek, correct?

19  A.  Correct.

20  Q.  Each time you identified yourself as a federal agent,

21  correct?

22  A.  Correct.

23  Q.  You Mirandized him?

24  A.  Correct.

25  Q.  And each time you're testifying that he admitted to

HAMBLEN - CROSS

1    illegal activity, correct?

2    A.  Correct.

3    Q.  You recall that being cooperative, that he was speaking

4    to you and admitting to what he had done, correct?

5    A.  Yes.  That's true.

6    Q.  That happened on December 11th, 2018, correct?

7    A.  Correct.

8    Q.  Happened again on March 9th, 2019, correct?

9    A.  Correct.

10   Q.  So at least twice he was cooperative with you?  Yes?

11   A.  I've only spoken with him twice.

12   Q.  Both times he was cooperative?  Yes?

13   A.  Yes.

14   Q.  Now, when you asked him about July 2017 when he was in

15   the Ukraine and he did these searches, he admitted to those

16   searches, correct?

17   A.  He did.

18   Q.  And when you asked him if he had contact with minors, he

19   said, No, correct?

20   A.  That's what he told me.

21   Q.  That's what he told you?  Yes?

22   A.  Correct.

23   Q.  And in all these, as I think your words were, thousands

24   of images, you have no evidence that he actually had contact

25   with minors, correct?

HAMBLEN - CROSS

```
 1    A.  That's correct.

 2    Q.  Now, when you first identified yourself and Mirandized

 3    him on December 11th, 2018, he admitted to possessing child

 4    pornography, which is a crime, correct?

 5    A.  Correct.

 6    Q.  And he knew he was in trouble at that point, correct?

 7    A.  Correct.

 8    Q.  And afterwards you released him, correct?  You let him

 9    go home?

10    A.  On December 11th, yes.  Correct.

11    Q.  Then you did a little bit of homework about him,

12    correct?

13    A.  That's correct.

14    Q.  You looked up his criminal history?

15    A.  Yes.

16    Q.  Did you find anything in there?

17    A.  I believe he had some type of charge related to -- I

18    would characterize it as terroristic threats or threats of

19    some nature related to a government office, but I don't -- I

20    didn't obtain the police reports or look further into it.

21    Q.  You are aware that that case was eventually dismissed

22    after he completed probation?

23    A.  I can't tell you what the exact disposition was.  I

24    believe the records that I reviewed showed that he was

25    convicted, and I'm not sure if there was some type of
```

HAMBLEN - CROSS

1    agreement with the court that it would later be dismissed if

2    he completed some type of terms.

3    Q.  You also discovered he was living at an address in

4    Maplewood, correct?

5    A.  Correct.

6    Q.  You didn't find anything else negative in his record,

7    correct?

8    A.  No, I did not.

9    Q.  Now, when he went back to Thailand in February, he

10   returned to the United States, correct?

11   A.  Yes.

12   Q.  He was stopped in Chicago?

13   A.  He went through customs, as everybody would, but I don't

14   know what you -- I don't know that he was stopped.  He was

15   not arrested or detained any more than anybody else that

16   travels through.

17   Q.  Are you aware -- you knew he was coming back on March

18   9th, correct?

19   A.  Yes, I did know.

20   Q.  And how did you know that?

21   A.  We have access to international travel records.

22   Q.  Okay.  And what did you learn?

23   A.  That he was returning on March 9th through --

24   Q.  From Chicago or from Thailand?

25   A.  So he was actually flying -- I believe -- I could be

1    wrong, but I believe he was flying from Hong Kong to Chicago

2    and then continuing from Chicago to Minneapolis.

3    Q.  Were you made aware of any illegal activity or any

4    problems when he was detained in Chicago?

5    A.  I wasn't aware of any problems.  I know that customs and

6    border protection detained his devices.

7    Q.  And did you find out if there was anything illegal on

8    those devices?

9    A.  They will be reviewed pursuant to border search, but

10    they have not yet been reviewed.  There's usually a several

11    day backlog, unless it's an emergency.

12    Q.  So as we sit right here now, you're not aware of

13    anything illegal on those devices, correct?

14    A.  I can't say either way, if there is anything on the

15    devices, because I haven't -- they haven't been examined.

16    Q.  So the answer is no, you are not aware of anything as of

17    right now?

18    A.  I'm not aware, no.

19    Q.  Okay.  Then he comes to Minneapolis, correct?

20    A.  Yes.

21    Q.  And, again, he is stopped by you?

22    A.  Correct.

23    Q.  You question him again?

24    A.  I did.

25    Q.  Did you search him?

1   A.  I did prior to taking him to the Ramsey County Jail, but

2   not prior to talking to him.

3   Q.  Did you find anything illegal on him?

4   A.  No, I don't believe we did.

5   Q.  Did you take his passport?

6   A.  I did.

7   Q.  Is that passport needed for international travel?

8   A.  Yes, technically it is needed.

9   Q.  And where is that passport again?

10  A.  It's at my office.

11          MS. ATWAL:  Thank you.  I have nothing further.

12          THE COURT:  All right.  Thank you.

13          Mr. Sing, anything further?

14          MR. SING:  Just a few follow-ups, Your Honor.

15

16                  **REDIRECT EXAMINATION**

17  **BY MR. SING:**

18  Q.  Special Agent Piontek -- I'm sorry, Special Agent

19  Hamblen, you were asked by Ms. Atwal if all images of child

20  pornography are particularly disturbing.  Do you recall

21  that?

22  A.  Yes.

23  Q.  Was there anything about the images that you reviewed of

24  Mr. Piontek's that you would say stood out to you as far as

25  being disturbing?

1   A.  So the very first image I -- as I said earlier, I was

2   present during the initial examination of his devices, and

3   then I left because it was kind of upsetting and it's not

4   something that I want to see the full scope of.  So the very

5   first image that we reviewed was a child, probably about

6   three years old, being raped.  And so after I saw that, I

7   saw a couple more videos, similar in nature, and I decided

8   to leave because I didn't feel like it was necessary for me

9   to see the full scope since I'm not the person doing the

10  actual final evaluation.  But it was disturbing enough that

11  I did not want to stay any longer to watch.

12  Q.  In your opinion, the video that you're describing was

13  particularly violent?

14  A.  Yes.

15  Q.  Ms. Atwal also asked you if Mr. Piontek has been

16  cooperative.  Do you recall that?

17  A.  Yes.

18  Q.  During your first interview, was Mr. Piontek honest

19  about the number of devices that would contain child

20  pornography?

21  A.  No, he was not honest about that particular question.

22  Q.  How so?

23  A.  Well, all of the devices contained some type of

24  evidence.  I believe he was partially honest in that the

25  vast majority of the collection of child pornography was on

1    the two devices that he described.  However, there was

2    evidence of -- for example, on one of the devices there had

3    been child pornography and our computer forensics agent was

4    able to identify there was child pornography but that it had

5    been erased or somehow altered.

6    Q.  And was Mr. Piontek honest with you about the quantity

7    of child pornography that he possessed?

8    A.  No.  I believe during the interview he said he had about

9    200 images, he may have said 300, I'm not sure, but it was

10   actually ten times that amount.

11   Q.  And you were also asked if you are aware that

12   Mr. Piontek has engaged in any criminal behavior between

13   December and March of this year.  Do you recall that?

14   A.  Yes.

15   Q.  And when you interviewed Mr. Piontek most recently, did

16   he make any admissions about continuing to view child

17   pornography to you?

18   A.  He did.  He stated that he continued to view -- that he

19   stopped the collecting.  He would merely view it on his

20   computer and not store the images.

21   Q.  During your interview with Mr. Piontek, you also had the

22   chance to ask him about whether he was being forthright or

23   minimizing his conduct.  Do you recall that?

24   A.  Yes.

25   Q.  Why did you ask him those types of questions?

1    A.  Well, I -- I just didn't feel that he was being fully

2    honest with me, and he, more or less, admitted that he had

3    minimized.  And I don't know if that's attributed to the

4    fact that he was embarrassed or something along those lines,

5    but, yes, I many times told him that I felt that he was

6    minimizing, he was trying to make his role or involvement

7    sound smaller than it actually was.

8    Q.  And what type of conduct did you suspect he engaged in

9    that you believed he was minimizing?

10   A.  His involvement with sex tourism, with attempting to

11   have sexual relations with children in foreign countries.

12   Q.  Ms. Atwal also asked you about Mr. Piontek's minimal

13   criminal history.  Do you recall that?

14   A.  Yes.

15   Q.  In your training and experience investigating child

16   pornography cases, is it uncommon for a defendant to have a

17   minimal criminal history in this context?

18   A.  No.

19   Q.  You were also asked about Mr. Piontek's address in

20   Maplewood; is that right?

21   A.  Yes.

22   Q.  Are you familiar at all with what's located around

23   Mr. Piontek's residence?

24   A.  I believe there's an elementary school I want to say

25   directly across the street, generally within a very short

1    distance from his house.

2    Q.  Okay.

3            MR. SING:  Thank you, Your Honor.  I have nothing

4    further.

5            THE COURT:  All right.  Thank you.

6            Ms. Atwal, anything further?

7            MS. ATWAL:  Yes, Your Honor.

8            THE COURT:  Okay.

9

10                   **RECROSS-EXAMINATION**

11   **BY MS. ATWAL:**

12   Q.  Okay.  So you just said that he told you there would be

13   evidence of child pornography in at least two devices,

14   correct?

15   A.  Correct.

16   Q.  Can you tell me what those two devices he said were?

17   The MacBook and the iPhone, correct?

18   A.  No.  I believe he said it was in his MacBook laptop

19   computer and the thumb drive that was found concealed,

20   wrapped up inside the sock inside the bottle.

21   Q.  Okay.  One of the devices that was found was the iPhone

22   7, correct?

23   A.  Correct.

24   Q.  How many images were found on the iPhone 7?

25   A.  I can't tell you.  I can tell you that I did not view

1   any images on that device.  I did a cursory search and

2   that's where I came up with the information about the

3   communications on the device.  I did not -- the platform I

4   was looking at it through didn't pull up images.  It would

5   only pull up content, such as communications.

6   Q.  So you don't know how many images were on the iPhone 7,

7   correct?

8   A.  I can't tell you.  I don't know.

9   Q.  You don't know how many images were on the iPhone 6,

10   correct?

11   A.  I do not know.

12   Q.  You do not know how many images were on the Apple iPad,

13   correct?

14   A.  That's correct.

15   Q.  You do not know how many images were on the digital

16   camera containing a 64 gigabyte disk, SD card, correct?

17   A.  I don't know.

18   Q.  When you first interrogated him, he told you that there

19   would be images and in your complaint you say that would be

20   embarrassing to him, correct?

21   A.  That's what his original statement was, correct.

22   Q.  He used the word that would be embarrassing to him,

23   correct?

24   A.  Correct.

25   Q.  Of the thousands of images that were located, is it your

1   testimony you viewed about three videos?

2   A.   Correct.  I personally viewed about three and then I

3   left the examination.

4           MS. ATWAL:  Thank you.  I have nothing further.

5           THE COURT:  All right.  Thank you.

6           Anything further, Mr. Sing?

7           MR. SING:  Not for Special Agent Hamblen, Your

8   Honor.

9           THE COURT:  All right.  Special Agent Hamblen,

10  thank you.  You may step down.

11          Mr. Sing, do you have any other witnesses to call?

12          MR. SING:  No, Your Honor.

13          THE COURT:  All right.  Do you have any other --

14  do you have any exhibits you intend to proffer?

15          MR. SING:  I do not.

16          THE COURT:  All right.  Ms. Atwal, do you intend

17  to proffer any information?  I know you're probably going to

18  be arguing, but is there any information you intend to

19  proffer that Mr. Sing should take account of when he is

20  making his argument?

21          MS. ATWAL:  No.  All the information I have will

22  come from the bond report itself, Your Honor.

23          THE COURT:  All right.  Then I will hear argument.

24  Mr. Sing.

25          MR. SING:  And if I can clarify, Your Honor, would

1    you like both the probable cause and detention arguments at

2    the same time?

3             THE COURT:  Um, yes, let's just go ahead and do it

4    that way.

5             MR. SING:  Okay.  Your Honor, my arguments on

6    probable cause are relatively straightforward.  The charges

7    in this case are possession of child pornography and

8    interstate transportation of child pornography.  Special

9    Agent Hamblen testified that as it relates to the possession

10   of child pornography, Mr. Piontek admitted to that conduct

11   and that there was an initial forensic examination of

12   Mr. Piontek's devices that he stated were within his

13   exclusive possession and control, and that both Special

14   Agent Hamblen and the forensic analysis of those devices

15   revealed thousands of images of child pornography involving

16   individuals and minors that are ages 12 and under.

17            So I think the combination of the admission,

18   Special Agent Hamblen's own review of the materials, and

19   testimony as it relates to the forensic analysis of those

20   devices establishes probable cause here that Mr. Piontek

21   possessed child pornography as described in the complaint.

22            On the other charge, which is interstate

23   transportation of child pornography, when Mr. Piontek was

24   stopped on December 11th of 2018, he was returning from

25   Thailand to Minneapolis, and that's when the devices were

1    seized that the child pornography was contained on.

2    Mr. Piontek also admitted during a Mirandized interview that

3    he traveled with the child pornography in interstate

4    commerce.  So I think here it -- the combination again of

5    Special Agent Hamblen's testimony, his investigation, and

6    Mr. Piontek's admission established that this child

7    pornography traveled internationally and into the country.

8    So those are my arguments as relates to probable cause.

9          On the question of detention, Your Honor, I would

10   start by noting this is a rebuttable presumption case.  The

11   charge of interstate transportation of child pornography

12   creates a rebuttable presumption that no condition or

13   combination of conditions can reasonably assure the safety

14   of the community or Mr. Piontek's appearance.  And my

15   understanding of -- my understanding as it is right now is

16   that Mr. Piontek is offering no evidence for the purpose of

17   this hearing.  So it would be his initial burden to present

18   that evidence.  And my understanding is he's choosing not to

19   do so.

20          THE COURT:  Are you saying that I'm not permitted

21   to take account of information in the bond report in that

22   regard?

23          MR. SING:  I think that you are permitted to take

24   that information, but my understanding is that probation

25   does not take any type of position as it relates to

1    rebuttable presumption, other than noting it.  So I'm

2    unaware of anything in the bond report that would

3    specifically rebut the presumption.

4              THE COURT:  Okay.

5              MR. SING:  I do acknowledge the recommendation of

6    the Probation Office in this case.  As you'll hear, the

7    government has some pretty serious concerns about that

8    recommendation.  But I wanted to note at least that the

9    Probation Office does not take into account the rebuttable

10   presumption, other than noting it.  They don't take a

11   position as to whether it's rebutted or how it would be

12   done.

13             They also do not take directly into account the

14   nature of the offense or the strength of the evidence in the

15   case as it relates to the recommendation that they are

16   making here.

17             Given those circumstances, the government does

18   have serious concerns about the recommendation to release

19   Mr. Piontek to a halfway house in this case.  And I'd like

20   to start with the safety of the community, which I think is

21   the main prong of my argument.

22             Your Honor, both charges here -- possession of

23   child pornography and interstate transportation of child

24   pornography -- are defined as crimes of violence in

25   Title 18.  And here we have a large collection of child

1    pornography involving images of children under 12 years old.

2    This child pornography was hidden in a surreptitious manner

3    and had it not been for a secondary examination at an

4    airport, it wouldn't have been found.  It was in a water

5    bottle or hidden in a false bottom of a water bottle.

6            Mr. Piontek has admitted that he's not only

7    downloaded and viewed child pornography in the United

8    States, he's also downloaded it abroad, and this suggests

9    someone who is highly motivated and sophisticated in their

10   manner of finding and locating child pornography.

11           You've also heard that the child pornography in

12   this case was particularly troubling, involving very violent

13   acts against a child that the special agent believes would

14   have been as young as three years old.

15           Mr. Piontek also affirmatively searched and used

16   his devices to search out opportunities to have sex with

17   children while he was abroad.  He lands in Kiev and he uses

18   his phone to search for pedo sex, child prostitutes, and he

19   has extensive chat logs involving the solicitation of sex in

20   countries known to involve, unfortunately, the exploitation

21   of children.

22           In the past ten years, Mr. Piontek has taken 24

23   trips abroad.  As the bond report notes, there's a mystery

24   here about his assets to do this travel, the reasons for

25   going to these countries, how he's paying for it.  And the

1    most logical explanation is what the facts demonstrate,

2    which is Mr. Piontek is motivated by sex tourism and he is

3    specifically motivated by finding the opportunity to have

4    sex with a child.  And after he's contacted by law

5    enforcement on December 11th, Mr. Piontek again leaves the

6    country and he goes to Thailand.

7         And, Your Honor, I think -- and I'll come back to

8    this at the end -- the one thing that stands out to our

9    office about this case in particular is that we have a

10   defendant who makes admissions about his curiosity and

11   fantasy about having sex with a child and that he is

12   motivated to take these travels and go out into the world.

13   He is motivated by that desire and realizing that fantasy.

14   That is a very real and exigent concern of the government

15   here, that now that he's facing potential punishment in this

16   case and on the charges as they are currently constituted --

17   not less than five years and up to possibly 20 years

18   imprisonment -- the motivation and the curiosity is probably

19   never greater than it is right now.

20        So if this is a fantasy and a desire that he has

21   and that he's been apparently honest about and motivated by

22   to travel for the last 10 years, now that he potentially has

23   eyes and ears on him, there's potentially never going to be

24   a stronger desire and motivation to satisfy his curiosity

25   than what he's facing right now.

1              As to risk of flight, as the bond report notes, he

2       has no significant ties to the State of Minnesota.  He's

3       unemployed.  He doesn't have any family in the area.  He has

4       no financial obligations that I'm aware of tying him to the

5       State of Minnesota.  He's a sophisticated traveler.  He has

6       extensive international travel.  He has a mysterious ability

7       to finance this travel, and we don't know where those assets

8       are or what they are, frankly.  And, Your Honor, we're --

9       the government hasn't charged it yet, but we're certainly

10      investigating this as a potential sex tourism case.  We

11      don't know the scope of this yet.  As Special Agent Hamblen

12      testified, there's a lot of devices here.  There's a lot of

13      chat logs here.  And it's going to take us time to go

14      through that and review it.

15              So the combination of these things and the

16      potential of more charges, I think, increases the risk of

17      flight.  But it's really the safety of the community that

18      leads to our strong position that detention is warranted

19      here.

20              The efficacy of the investigation, it's worth

21      noting that the bond report makes note that Mr. Piontek

22      worked for Comcast for an extensive period of time.  We are

23      not sure yet what the evidence is going to reveal, but we

24      already know what he has used his devices for, what he has

25      used the internet for, and what he's traveled for.  Someone

1    who has worked for an internet conglomerate is someone who

2    is pretty sophisticated in using computers.  Allowing him

3    back into the community with -- even in a halfway house, and

4    I understand there are parameters in a halfway house, but we

5    don't know what this will do to the potential of other

6    evidence.  We don't know what this does as far as logging

7    into cloud accounts.  We have very real concerns about what

8    this could lead to.

9            The defendant admitted and Special Agent Hamblen

10    said this, that he never expected anyone to find his child

11    pornography.  That's why it was hidden.  And so now that

12    this has been found, we worry about what that could lead to.

13            And I think I'll end with, and this is where I

14    promised I would end, this idea that we would put someone

15    back out into the community in any format who said I have a

16    curiosity and a motivation to find or have sex with a child

17    seems beyond the pale.  I think that's what danger to the

18    community is probably speaking of most readily.  And this

19    case stands out to our office because it's not often that

20    someone is saying that's their motivation and someone who's

21    already shown a willingness to act on it and has -- I'll

22    leave it there, Your Honor.  Thank you.

23            THE COURT:  Thank you.

24            Ms. Atwal.

25            MS. ATWAL:  Your Honor, on the issue of probable

1    cause, I'll rest on the record.  And let me start with where

2    Mr. Sing left off.  He said after knowing this information

3    about somebody discussing having sex with a child, having

4    possession of child pornography, releasing them is just

5    wrong.  Let me remind the Court that on December 1st -- or

6    December 11th, 2018, agents found child pornography in a

7    secret area.  They found child pornography on devices.  They

8    got a confession from him and they released him.  And that

9    was back in December of 2018.  And what we do know is that

10   when they searched him again just over the weekend, as of

11   right now there is no evidence to suggest he was in that

12   same type of illegal behavior.

13          I want to first address the risk of flight.  And I

14   would remind the Court that the passport that will allow

15   Mr. Piontek to travel is with federal agents.  As the Court

16   knows from reading the bond report, he's born and raised

17   right here in Minnesota.  He went to high school and college

18   right here in Minnesota.  He inherited his grandfather's

19   house and has lived at that same house for 35 years.  And we

20   heard from the agent himself he knows that Mr. Piontek lives

21   right in Maplewood, and that is the address -- he did

22   provide a Maplewood address to the probation officer.

23          When this case came up on December 11th, 2018, he

24   was questioned and he knew what he was doing was illegal.

25   Having child pornography, nobody advertises that.  Nobody

1  puts it out there on the front street saying I'm collecting

2  child pornography.  The very nature of the offenders that do

3  view child pornography is that they keep it secret, whether

4  they use anonymous names, whether it's on social media or

5  through the email.  There's nothing different about this

6  case, about him hiding any type of child pornography.  But

7  what's more telling as it goes to the question of flight is

8  he leaves and he goes to Thailand in February.  He knew he

9  was under investigation.  He knew he was in trouble.  But

10  what does he do?  He returns.  And he not only returns to

11  the United States, he returns right to his house that he's

12  lived at for 35 years.  He is stopped in Chicago and then

13  takes another flight back here to Minnesota.  And, again,

14  never without a -- no issues whatsoever.  There's no

15  indication that anything illegal is found on him or that he

16  attempted to flee.  There was none of that evidence that was

17  presented to the Court.

18        We know from reading the bond report he worked at

19  Comcast for over 16 years.  The government would like to

20  make the assumption because he worked at Comcast customer

21  service that that means he has knowledge about use of the

22  internet and could hide things.  We don't even know what

23  type of job it was at Comcast.  They are just making that

24  presumption that he has some kind of technical experience.

25        He is not a risk to flee.  He showed up when he

1    came back from Thailand in February, came right back to

2    Minnesota, and he has his house that he's had for 35 years.

3              His eyes and ears were open at that time.  They

4    were open back in December, and they were open when he came

5    back.  And he knew that at any time that he could get in

6    trouble and here he is now in custody.

7              What the Court can do to assure that he stays

8    right here in Minnesota at the house in Maplewood is to

9    place an ankle bracelet on him.  When probation looks at

10   conditions of whether somebody should be released or kept in

11   custody, they do in fact look at the offense, and we see

12   that the probation officer in fact both looking at risk of

13   flight and safety indicates the offense itself.  So to say

14   that they don't look at the offense conduct, that's simply

15   not true.  It says the offense charged right in assessment

16   of non-appearance and assessment of danger.

17             So let's move on to the assessment of danger, the

18   safety of the community.  This is a possession of child

19   pornography case.  It's not a production.  So the government

20   can argue all day and all night that there's a chance that

21   he will have -- that he may have had contact with minors.

22   We have some text message where he -- or, excuse me, some

23   messages or some internet searches that he did, but when the

24   agent asked him if he had any contact with the minors, his

25   answer was "No."  And in those thousands of images that they

1    found there's no indication that he produced any type of

2    child pornography.  It is a possession of child pornography

3    type of a case.

4            There's no type of prior violence on his record.

5    We see that there's terroristic threats, where there was a

6    stay of adjudication, and once those conditions were met,

7    which I will note was without any type of issues, meaning he

8    is amenable to probation, the case was dismissed.

9            The Court can continue to make sure that the

10   community is safe by making sure he doesn't have a smart

11   phone, monitoring any type of computer use, and put a

12   condition on to have no contact with minors.  He lives by

13   himself.  There are no minors inside his home.  And the

14   Court can also order a mental-health evaluation if the Court

15   feels that that's needed, too.

16           What I also know is that he will be supervised by

17   United States Probation Officer Mike Alberts.  Mike Alberts

18   actually supervises people convicted of sex crimes.  He's an

19   experienced probation officer that knows how to supervise

20   people that have been convicted of sex crimes.  Here we have

21   a client that has not been convicted.  He simply has been

22   accused of a crime.  Through the supervision of Mike Alberts

23   of Probation and all the conditions that Probation lists, I

24   would submit to the Court there are conditions that the

25   Court can impose that would include an ankle bracelet, home

1    detention, and release to his home, computer monitoring, any

2    type of treatment the Court feels is deemed that is

3    necessary.

4          THE COURT:  What about the concern expressed by

5    Special Agent Hamblen that his home is near a school or some

6    kind of facility where children are during the day?

7          MS. ATWAL:  Your Honor, it's not from -- what I

8    could tell from Google Maps, it's not across the street as

9    the agent -- can't say he knew for sure, he just thought

10   maybe it was across the street.  Again, if he is on house

11   arrest, that should assure that that would be safe enough.

12   Even if he's at a halfway house, there's schools, there's

13   kids, school buses that go.  It's going to be very difficult

14   to say that he can't be anywhere near a school.  It's just

15   going to be kids that are going to be there.  But what you

16   can say is no contact with any type of minors or don't come

17   into 50 yards of any minor.  If he sees a minor, he can

18   move.  And the GPS monitoring that Probation has, they could

19   tell if he's getting out of his house or if he's moving away

20   from his house or coming near a school.

21          And, again, looking back at his history, there's

22   no indication that there was ever any issues with kids in

23   the school, whether there was peeping toms or that he was

24   behaving inappropriately around children near that school.

25   This is the same address he's had for 35 years.

```
1              THE COURT:  Okay.
2              MS. ATWAL:  Thank you, Your Honor.
3              THE COURT:  Thank you.
4         Mr. Sing, anything by way of reply?
5              MR. SING:  Yes, Your Honor.  Thank you.
6         So, Your Honor, Ms. Atwal mentions that on
7    December 11th, 2018, law enforcement released Mr. Piontek
8    after they detained him for likely possession of child
9    pornography.  I would note at that time they had not done
10   the forensic review of the devices yet that revealed the
11   internet searches for seeking out child prostitutes and pedo
12   sex.  That came afterwards.
13             And I would submit that this is a case about
14   Mr. Piontek engaging in hidden things.  He hides the thumb
15   drive that contains child pornography in the bottom of a
16   water bottle.  And Ms. Atwal says, well, you know, this is a
17   child pornography case and no one advertises that.  Well,
18   that's true, but after he's stopped by law enforcement, what
19   does he do?  He goes back to Thailand, a location that is
20   known for sex tourism and child exploitation.  He admits
21   that he has continued to access and view child pornography.
22   I don't think that this argument that, well, look, he's not
23   a risk of flight because after he knew he was in trouble, he
24   went abroad and then returned is something that rules in
25   favor of Mr. Piontek.  To me what it suggests is someone who
```

1    knew that they were in trouble and despite knowing that they

2    were in trouble, their addiction and their motivation to

3    engage in sexual conduct and to have child pornography was

4    so great that they were willing to go again anyways.  And

5    that's why I think detention here is the most warranted.  If

6    we let Mr. Piontek out of custody, there is no reason to

7    believe that he is going to stop viewing child pornography

8    or that he will not make good on his noted and admitted

9    desire to have sex with a child.  And, again, it's that

10    desire for action that makes this case different.  Ms. Atwal

11    can claim that it is just the government making the

12    argument, but it's Mr. Piontek who admitted it.  He said

13    that it was an added bonus that the locations that he

14    traveled to were places that he could potentially have sex

15    with a child.

16        And as the Court notes, he lived near a location

17    that children were known to have.  I would submit that this

18    is just not something we can afford to get wrong.  This is a

19    clear and present danger to the community.  And Mr. Piontek

20    has demonstrated through his conduct already that if he's

21    released, he's going to find a will and a way to continue to

22    make choices that put people in harm's way.

23        Thank you, Your Honor.

24        THE COURT:  Thank you.

25        Ms. Atwal.

1           MS. ATWAL:  Your Honor, just two points:  As it's

2     stated in the probation report, in the bond report,

3     Mr. Piontek said that he has a girlfriend in Thailand.  He

4     lists that straight up.  So to make the assumption that he

5     went back there to look at more child pornography, there's

6     nothing supporting that, because there's no evidence that

7     when he came back to Minnesota on Saturday that he was

8     possessing child pornography.

9           In relation to that, he didn't know that he was

10    really in trouble and that he fled and it was because the

11    agents -- or the -- excuse me.  I'm sorry, let me start

12    again.

13          On December 11th, when he was first encountered by

14    customs agents, that's when he confessed that there was

15    child pornography.  The very next day, December 12th, is

16    when the devices were turned over and forensics agents

17    evaluated those devices and child pornography was found.

18    They knew exactly where Mr. Piontek lived.  They could have

19    gone, arrested him that day.  He was not arrested that day.

20    It went half of December, all of January, all of February,

21    and then March 9th is when they decided to arrest him.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          First on the issue of probable cause, I do find

25    probable cause based on Special Agent Hamblen's testimony

43

1    that -- to support the charges in the complaint with respect

2    to possession of and interstate transportation of child

3    pornography.  So Mr. Piontek will be moving forward with

4    this case to face those charges.

5         On the issue of detention, first, as counsel for

6    the government notes, this is a rebuttable presumption case.

7    However, even though the counsel for Mr. Piontek did not

8    introduce new testimony, counsel is absolutely entitled to

9    cite information from the bond report that might tend to

10   rebut that presumption.  And I do find that the presumption

11   has been rebutted, that you still have to move forward to

12   whether there's going to be detention, but I do find that

13   the presumption was rebutted.  That means that the burden of

14   proof is back on the government to prove either by a

15   preponderance of the evidence that there are no conditions

16   or combination of conditions that could reasonably assure

17   that Mr. Piontek will appear or by clear and convincing

18   evidence that there are no conditions that would reasonably

19   assure the safety of the community.  And in that connection,

20   although it is a very, very close call here, I am going to

21   accept, with some modifications, the recommendation of

22   Pretrial Services and find that there are conditions that

23   would reasonably assure that Mr. Piontek will appear and

24   would reasonably assure that he will not endanger the

25   community as this case proceeds.

1          Mr. Piontek, you need to understand that this was

2     a very close question.  I'm going to talk to you about those

3     conditions, but I think it's safe to say -- although I might

4     not be the judge you're in front of the next time if there

5     is a problem -- I think it's safe to say that if you don't

6     strictly adhere to all of these conditions, there is an

7     outstanding chance that you won't get another chance, that

8     you will be detained.  So you need to understand how

9     important it is that you adhere to these conditions.

10         Let me talk sort of in broad strokes first, and

11    then I'll get down to details.  I said I was going to accept

12    the recommendation of Pretrial Services, but I am modifying

13    it a bit.  First, you will be confined to a halfway house.

14    Based on the indication that your home is near a school or

15    perhaps a daycare center, but someplace where children are

16    during the day, I am not comfortable that releasing you to

17    your home would provide the reasonable assurance that I'm

18    looking for in terms of safety of the community.  So you are

19    going to be confined to a halfway house.

20         You will be on location monitoring.  And -- and

21    this is where I'm departing from the conditions proposed by

22    Pretrial Services -- I am going to require that you be on

23    home incarceration.  I am not comfortable having you look

24    for a job or leave, except for the most -- for the narrowest

25    list of conditions, because I'm not satisfied under the

1    circumstances that that would provide the kind of assurance

2    that you would not find a way to access child pornography or

3    potentially -- and I absolutely hear Ms. Atwal and she's

4    right, at this point you haven't even been charged with

5    contact offenses with a minor, but given your

6    acknowledgement that you have some desires and some

7    motivations in that regard, I believe that you should not be

8    allowed to leave the halfway house, except for the very

9    narrowest sorts of conditions.  And I think that will make

10    it more possible for Pretrial Services to adequately monitor

11    your location.

12         So let me start from the top and tell you about

13    these conditions.  First, it is a condition that you must

14    appear for all court proceedings in this matter.  Anything

15    at which your attendance is required by the court, you have

16    to show up for that.  That means you need to stay in close

17    touch with your counsel so that you know when you need to

18    show up in court and where you will be showing up.

19         You will be signing what's known as an appearance

20    bond.  That doesn't require you to put up any money, but it

21    does provide that if you are -- if you fail to appear when

22    the court requires you to or if you're convicted -- and you

23    are presumed innocent, but if you're convicted you are also

24    promising to show up to serve any sentence that the court

25    may impose.  If you fail to appear in any respect as

1    required by the court, then you will be required -- in

2    addition to all of the other consequences, you will be under

3    an additional financial penalty of $25,000.

4            You will be supervised by Officer Alberts from the

5    Pretrial Services Office.  Pretty much anything you may want

6    to do by way of leaving the halfway house, except for very

7    limited exceptions, would have to be approved in advance by

8    Officer Alberts.

9            You cannot violate any, any federal, state or

10   local crime while you are on release.  Now, you shouldn't be

11   -- or local law while you are on release.  Now, you

12   shouldn't be violating any laws anyway, but it is a

13   condition of your release that you remain law abiding, not

14   just in connection with the kinds of offenses with which

15   you've been charged, but law abiding across the board.  It

16   would violate the conditions of your release and potentially

17   put you at risk of being detained for the remainder of your

18   case if you violate any law while you are on release.

19           As I've already said, you will be submitting to

20   supervision by Pretrial Services.

21           You've already surrendered your passport.  If you

22   have any other kind of travel document, you need to

23   surrender that as well.  And you may not obtain a passport,

24   a green card, a visa, any kind of travel document.  You

25   can't apply for a new one while you are on release while

1    your case proceeds.

2            Since you will be on home incarceration at the

3    halfway house, this next piece is probably moot, but you may

4    not leave the State of Minnesota, except as approved in

5    advance by your supervising officer.

6            You will maintain residence at a halfway house.

7    You will follow the rules of that facility.  So if they have

8    some additional rules and some additional restrictions that

9    don't happen to be part of what I'm saying here, you still

10   have to follow them.  And it's a condition of your release

11   to the halfway house that you will follow any rules and

12   restrictions that they establish, in addition to the

13   conditions that I'm establishing here.

14           You can't possess a firearm, a destructive device

15   or any kind of weapon.

16           You will be on home incarceration.  I am making

17   that change in the recommended conditions.  That restricts

18   you to 24-hour-a-day lockdown at the halfway house, except

19   for medical necessities and court appearances or other

20   activities that are specifically approved in advance by the

21   court or by your Pretrial Services officer.

22           I am removing the proposed condition from Pretrial

23   Services that you continue or actively seek employment

24   because, obviously, employment would not be consistent with

25   the restrictions I'm placing you on at the halfway house.

1          You do have to submit to location monitoring, and

2    your Pretrial Services officer will work with you to

3    establish the appropriate kind of location monitoring.  And

4    you may not do anything, anything to tamper with the

5    effectiveness of that device.

6          If you have any kind of contact with

7    law-enforcement personnel, whether it's in connection with

8    this case or for any other reason, any contact at all with

9    law-enforcement personnel of any branch of government, you

10   need to report that immediately to your supervising officer

11   so that they hear it from you before they hear it through

12   the grapevine.

13         You may not possess or use a computer or any

14   device that gives you access to any kind of internet

15   service.  There's some language here that would have more

16   applicability if you were going to be at home or at work,

17   but if it came to pass that you for some reason had use of a

18   computer, they would be allowed to install monitoring

19   equipment on that, but I think that's moot here given that

20   you will be in a halfway house and you're not allowed to

21   have a computer or access of any kind to any online service.

22   You may not -- and that includes you may not have access to

23   a cell phone.  But you may not access any kind of child

24   pornography of any sort, regardless of how it may come into

25   your presence or come into your possession.  You may not

1    possess it.  You may not access it.

2          You will also upon request provide your

3    supervising officer with access to any financial information

4    that they may request, whether it's credit-card bills,

5    credit reports, bank statements or telephone bills, so that

6    they can do what they need to do to help confirm that you

7    have not violated or seeking to violate any of the terms and

8    conditions of your release.

9          You may not associate with individuals under the

10   age of 18, unless in the presence of a responsible adult who

11   is aware of the nature of your background, the nature of

12   these offenses with which you've been charged, and who has

13   been approved in advance of your Pretrial Services officer.

14         Mr. Sing, I know that you have argued strongly for

15   detention, and I'm -- you've heard my decision on that.

16   Given where I'm at on detention, are there any other

17   conditions that you would like me to consider at this time?

18         MR. SING:  Your Honor, just one clarification.  I

19   know that you had mentioned that Mr. Piontek not have a cell

20   phone.

21         THE COURT:  Uh-huh.

22         MR. SING:  It's my understanding that at the

23   halfway house they do have the ability to get flip phones,

24   and I just wanted to make sure that your order would

25   prohibit possession of a flip phone as well.

 1                    THE COURT:  Okay.  That would be my inclination.

 2              Ms. Atwal, do you want to be heard on that?

 3                    MS. ATWAL:  Your Honor, I will let the Court know

 4       it is a flip phone.  You cannot access the internet on that.

 5       I know my clients had it usually when they want to get a

 6       hold of me or whatever it is.  It has no internet

 7       capability.

 8                    FEMALE SPEAKER:  Judge, it's also a phone that has

 9       to be pre-approved by the probation officer and the halfway

10       house.  It's a very specific phone that's allowed.

11                    THE COURT:  Okay.  All right.  So I will -- I will

12       not prohibit a flip phone that has been approved by the

13       halfway house and approved by the supervising probation

14       officer, but that's it.  No other kind of phone, cell phone

15       or any other non-approved flip phone.  There will be one --

16       it sounds like one specific type that is approved in

17       advance.  And even if you think you've got something that's

18       sort of the equivalent of that, that's off limits, just the

19       one that we've been talking about here in court.  I will add

20       something to these conditions to try to be more clear about

21       that before I provide them to Ms. Atwal for sign-off.

22                    Mr. Sing, anything else?

23                    MR. SING:  Thank you, Your Honor.  With that

24       clarification and as long as that type of a phone will be

25       monitored, that was the only real concern.

1          THE COURT:  Let me ask about that of Pretrial

2     Services.  Are these -- is there the ability to monitor

3     those -- the pre-approved type of flip phone?

4          FEMALE SPEAKER:  Correct.  And that is covered in

5     condition S, that the phone would be reviewed.

6          THE COURT:  All right.  All right.  Very well.  It

7     will take me a moment to kind of tweak this condition to

8     make sure that we -- that it accurately states what

9     Mr. Piontek will have access to and what he will not have

10    access to.

11         Other than that, I think that covers the key

12    conditions here.  These will be in writing, Mr. Piontek.

13    You'll have an opportunity to review these with Ms. Atwal.

14         I've already said, but let me reiterate, how

15    important it is that you abide by these conditions.  First,

16    if you don't, you will be back in court with Mr. Sing or one

17    of his colleagues arguing that, well, that failed, you're

18    going to have to be detained now.

19         Second, some of these conditions -- for example,

20    the condition that you not commit any new offenses -- not

21    only would you -- if you commit new offenses, not only would

22    you have to face the consequences of those offenses, but

23    there's some conditions when committing a new offense while

24    you're on pretrial release for another offense is yet

25    another offense.  So we get this kind of snowballing effect

1    of bad consequences.

2              We've talked about the $25,000 penalty if you

3    don't show up.

4              In addition, if you are convicted -- and I have

5    said before, but I can't say it strongly enough -- you are

6    presumed innocent, but if you are convicted, then one of the

7    things the judge can and will consider is whether -- is how

8    you behaved yourself while you are on release.  If you

9    strictly comply with all of the conditions, that's something

10   the judge can consider to your benefit.  If you mess up

11   while you are on release, that is absolutely something the

12   judge can consider and will consider in connection with

13   sentencing.  So it has implications in that context as well.

14   The documents you get include a whole page about the bad

15   things that can happen to you if you don't comply with these

16   conditions.

17             Do you have any doubt in your mind how important

18   it is that you comply with each and every one of these

19   conditions while you have the opportunity to be released?

20             THE DEFENDANT:  I have no doubt in my mind, Your

21   Honor.

22             THE COURT:  Okay.  Then what I will do -- you

23   know, we're late starting initial appearances already, so

24   I'm trying to think practically about -- I do want to take a

25   couple minutes and make sure this condition on cell phone

1    and computer access is exactly the way we've talked about

2    it, and that will take me a couple of minutes to do.  So I'm

3    trying to think how best to manage that.  Well, rather than

4    talk about it, let me just get it done here so that then,

5    Ms. Atwal, you can go through this with Mr. Piontek and we

6    can keep things moving.  So give me a moment.

7                 (A brief discussion was held off the record.)

8                 MALE SPEAKER:  Thank you, Your Honor.

9                 THE COURT:  All right.  Thank you.

10                All right.  Hopefully you'll be able to read my

11    handwriting, but here's what I've done with condition S:

12    The defendant shall not possess or use a computer, cell

13    phone or have access to any online service without the prior

14    approval of the United States Probation and Pretrial

15    Services Office.  The defendant may have a flip phone if

16    pre-approved by the halfway house and Pretrial Services

17    provided it has no internet access and is monitored as set

18    forth herein.  And then that paragraph goes on to describe

19    what may be done to monitor the phone.

20                Does that address that particular concern of

21    yours, Mr. Sing?

22                MR. SING:  It does, Your Honor.  Thank you.

23                THE COURT:  All right.  Ms. Atwal, does that sound

24    like the condition we were describing a few minutes ago?

25                MS. ATWAL:  Yes, Your Honor.

1          THE COURT:  All right.  Then I think this is

2   ready, Ms. Atwal, for you to review with Mr. Piontek.  I'll

3   let you do that.  And I will recess court now, but you

4   should have a few minutes to do that before they start

5   bringing people up for initial appearances, and then you can

6   hand the signed documents to our clerk.  All right?

7          MS. ATWAL:  Thank you, Your Honor.

8          THE COURT:  All right.  Just a moment.  All right.

9   I think everything is there.  All right.  Anything further

10   for the government?

11          MR. SING:  No, Your Honor.  Thank you.

12          THE COURT:  All right.  Ms. Atwal, anything

13   further for Mr. Piontek?

14          MS. ATWAL:  No, Your Honor.  Thank you.

15          THE COURT:  All right.  We'll be in recess.

16          THE COURTROOM DEPUTY:  All rise.

17          (Court adjourned at 2:50 p.m.)

18                    *     *     *

19          I, Debra Beauvais, certify that the foregoing is a

20   correct transcription from the audio recording of the

21   proceedings in the above-entitled matter to the best of my

22   abilities.

23          Certified by:   *s/Debra Beauvais*
                            Debra Beauvais, RPR-CRR

24

25